# THE PEOPLE OF THE STATE OF NEW YORK EX REL. THE UNION AND ADVERTISER COMPANY, RESPONDENT, *v.* THE BOARD OF SUPERVISORS OF THE COUNTY OF MONROE, APPELLANT.

*Session laws — their publication — a designation of a newspaper therefor, is not changeable — an agreement to publish for less than the legal rates is void — a second unqualified designation — public policy.*

Chapter 280, Laws of 1845, as amended by chapter 515, Laws of 1886, requires that a majority of the members of a board of supervisors, representing respectively each of the two principal political parties into which the people of a county are divided, shall designate in writing a newspaper, fairly representing their party, to publish the session laws, and that such designation shall be signed by them and filed with the clerk of the board of supervisors.

A majority of the Democratic members of the Board of Supervisors of Monroe County, on December 2, 1889, designated the "Brockport Democrat," as a paper for such purpose, filed the designation with the clerk, and the board of supervisors, by resolution, subsequently adopted it.

*Held,* that after a lawful designation was once made, there existed no power thereafter to change it.

By the aforesaid act of 1845, as amended by chapter 443, Laws of 1887, it is provided that the sum to be paid for publication, in counties having a city of over fifty thousand inhabitants, shall not be less than thirty nor more than fifty cents per folio. The city of Rochester, in the county of Monroe, had over fifty thousand inhabitants.

The designation was upon condition that the sum paid for publication should not exceed twenty-five cents per folio, and this sum was fixed upon an offer or bid, made to said members by said newspaper, to do the work at that price.

*Held,* that, as the minimum price fixed by statute was thirty cents per folio, a designation at a lower price violated the statute, and was of no effect.

On December 3, 1889, the day following their first designation, a designation of the "Union and Advertiser," a newspaper published in the city of Rochester, was made by said members.

*Held,* that this designation of the Union and Advertiser went into effect at once, and that said "Union and Advertiser" was entitled to recover under it for the publication of the session laws, and also for publishing notices of sales of lands for unpaid taxes, which, by statute, are required to be published in the same manner.

That the statutes upon this subject indicate a clear public policy that no opportunity shall be given to members of either political party to designate, through motives of false economy, a newspaper not calculated to give publicity to the session laws; and no agreement to publish the same at prices below the legal rates is legal.

APPEAL by the defendant, the Board of Supervisors of Monroe County, from an order, entered in the clerk's office of said county on the 18th day of February, 1891, directing that a peremptory writ of *mandamus* issue requiring said board to audit and provide for the payment of the claims of the relator for printing and publishing the session laws, and notices for the sale of lands for unpaid county taxes, for the year 1890.

*William F. Cogswell*, for the appellant.

*Nathaniel Foote*, for the respondent.

MACOMBER, J.:

The relator's claim for printing and publishing the session laws and notices of sale of lands for unpaid taxes for the year 1890 was properly presented to the Board of Supervisors of Monroe County and by that body rejected. This proceeding calls upon the court for the high prerogative writ of *mandamus* compelling the defendant to pay the amount of the bill thus rendered, without putting the relator to an action at law therefor.

There is no question made of the fact that the relator actually printed and published the session laws and the notices of sale for unpaid taxes required by statute to be published in Monroe county, nor of the correctness of the bill rendered therefor. The only defense is that the defendant is not in any respect liable to the relator for the expense of such printing and publication.

Chapter 515, section 3 of the Laws of 1886, so far as it is material to the question involved in this appeal, is as follows: "It shall be the duty of each board of supervisors in the several counties of this State, at their annual meeting, or at any special meeting called for the purpose, to appoint the printers for publishing the laws in their respective counties. The appointment shall be made in the following manner: The members of the board of supervisors representing respectively each of the two principal political parties into which the people of the county are divided, or a majority of the members of the board of supervisors representing respectively each of such political parties, shall designate in writing a paper fairly representing the political party to which they respectively belong to publish the

laws, and such designation shall be signed by the members making it and filed with the clerk of the board of supervisors, and the two papers so designated shall publish the laws."

Other statutes, not necessary to refer to in detail, make it incumbent upon the board of supervisors to designate the same newspapers also for publishing notices of sale of lands for unpaid taxes or for the redemption thereof. In pursuance of this statute of 1886 a majority of the Democratic members of the Board of Supervisors of Monroe County did, by a writing signed on the 3d day of December, 1889, and filed with the clerk of the board on the following day, designate the relator as the paper to publish such laws and notices. That designation is as follows: "In compliance with the laws of the State of New York (chap. 515, Laws of 1886), we, the undersigned, constituting a majority of the Democratic members of the Board of Supervisors of the County of Monroe, do hereby designate The Rochester Daily Union and Advertiser as the paper representing our political views to publish the session laws for 1890." This paper was signed, as is indicated upon its face, by a majority of the members of the board belonging to the Democratic party.

Under this designation it would follow, as a matter of course, that the bill presented for the services so performed to the county should have been audited and paid, unless such designation was insufficient, illegal, or unless there had been a previous designation by the same persons of some other newspaper to perform such services. No question can be made but that the designation of the relator was in terms strictly in conformity to the provision of the statute quoted. Nor is there any question of fact presented but that the persons signing the same did, in truth, constitute a majority of the members of the board who professed to belong to the Democratic party.

The defense, however, is based upon the proof that on the 2d day of December, 1889, one day before this action of the Democratic members in behalf of the relator was had, the same body of persons had designated the Brockport Democrat to publish such laws and notices. It is true that on the day last named thirteen members of the board of supervisors made the following designation in writing, and the same was filed with the clerk of the board and adopted by

the board itself in a subsequent meeting.  " We, the Democratic members of the board of supervisors, have selected the Brockport. Democrat to publish the session laws, at an expense not to exceed twenty-five cents per folio."

Very little need be said upon the subject of the power of the Democratic members of the board to change their designation of a newspaper when once legally made.  In my judgment, they had no such power, where the certificate making the same had once been filed with the clerk of the board, and had been adopted by resolution of the board, as was done in this case.  The body of persons to which is given the power to designate a newspaper for the purposes above named is not a legislative body in any respect.  There is nothing in the statute which requires the members of either of the two political parties, in order to select a newspaper for publishing these laws, to act together as a body in consultation one with another over the subject; but each person may act independently, and if a majority of the whole number, belonging to a given party, concur in the selection of a newspaper for the publication, that paper becomes, by operation of the filing of the designation, the organ for publishing such laws and notices.

There is in evidence before us a paper signed by the same majority of Democratic members of the board, dated December 4, 1889, which declares that the original action taken on the second day of that month, by which the Brockport Democrat was appointed, was done through misinformation of the members as to the political character and status of the last-named newspaper, and, further, " that they are now satisfied that the said Brockport Democrat does not meet the requirements of the statute, that it shall fairly represent the political party to which they belong; that the Rochester Union and Advertiser does so represent that party, and hence the reconsideration of the original action and subsequent designation of a paper to meet the requirements of the statute."  In the affidavit made by the clerk of the board of supervisors it is stated that this document was not filed with him as such clerk, though the affidavit of Mr. Balkam asserts that the same was made and filed.  This difference, which has been made the subject of some comment by the learned counsel for the appellant, does not seem to me to be of any importance.  Undoubtedly, Mr. Balkam, when this paper was

prepared, understood that the same was to be left with the clerk of the board, and he had reason to believe that it had been so left; yet the clerk himself must be deemed absolutely to know whether given papers are on file with him or not. The re-designation of the Union and Advertiser would itself be a sufficient reconsideration of the previous appointment or designation. So that no writing of this kind was required to be made or filed. The only importance, therefore, that can be attached to it is, that the persons constituting a majority of the Democratic members of the board were deceived and misled in their previous action in thinking that the Brockport Democrat fairly represented the political party to which they belonged. The requirement of the statute is, that the paper to be thus designated shall fairly represent the political party to which the members designating it belong. The question whether or not a given newspaper so represents the political faith of the persons designating it for the purpose of publishing the session laws belongs rather to the persons themselves than to the court. Indeed, such is the peculiarity of the question, that it is doubtful whether any court would undertake to review the determination of the members of the board of supervisors when once fairly and intelligently made upon that question.

It appears, however, that the Brockport Democrat is published in the village of Brockport, which contains a population of less than five thousand persons, and that its circulation throughout the county is very small, and in the city of Rochester, which contains 136,000 people, is hardly appreciable. That this newspaper has professed a Democratic faith for the last three or four years is not questioned. But a belief in the doctrines of a party is not, as it seems to me, conclusive evidence of the fair representation of that party when applied to a newspaper. Many other things must be taken into account, such as its character, influence and circulation. There is nothing, it is true, in the statute that requires the selection of a paper having the largest circulation. Yet it is apparent that the influence of a paper, as ascertained by its circulation, must enter somewhat into the question whether the same fairly represents one of the great parties.

A brief history of the laws relating to the matter of the publication of the statutes and of legal notices goes far to show that it was

the intention of the legislature to give the greatest publicity to such publication, and not to hide it in weekly papers of limited circulation. By chapter 280 of the Laws of 1845, section 1, provision was made for the publication in at least two newspapers in the counties of the State, of these matters, and by section 2 the like publication of all laws of a local nature. By section 3 of the same act the board of supervisors was required to appoint printers for publishing such laws in their respective counties, no supervisor being allowed to vote for more than one paper, thus intending to secure the publication in two papers representing the principal political parties. The charge for such publication was fixed at .the rate of ten cents for each folio, with a general limitation of an expenditure not exceeding fifty dollars to each paper. By chapter 215 of the Laws of 1870,. section 3 was amended so as to secure in fact, as well as in theory, the designation of two papers of opposite politics for such publication. By chapter 515 of the Laws of 1886, as quoted above, an important change was made as there indicated. This legislation, at. least, seems to have secured what the act of 1845 clearly contemplated, the designation of two papers of opposite political faith for publication of the session laws. Other changes have been made which it is not necessary here to note as not bearing upon the point to which this opinion comes. But by chapter 443 of the Laws of 1887 it was provided:

"§ 6. The publisher of each of the papers so designated, as afore-said, shall be entitled to receive for publication of the laws above specified a sum not exceeding fifty cents nor less than twenty cents for each folio, except in counties having a city of fifty thousand inhabitants. In counties having a city of over fifty thousand inhabitants, by the last preceding census, the sum to be paid for such publication shall not be less than thirty cents or more than fifty cents for each folio. The specific rate per folio to be paid in each county shall be fixed by the board of supervisors thereof within the limits above specified."

In my judgment, under this law, the designation by the Democratic members of the board of supervisors, of the Brockport Democrat to publish the session laws, was in violation of this statute, inasmuch as it contained an absolute condition that the expense thereof should not exceed twenty-five cents per folio; and that, consequently, such

designation went for naught, and that the subsequent proper and lawful designation of the relator was legal and binding upon the board.

The object of this legislation is, as has already been intimated, to secure a publication which shall be a notice to the people interested in the subject-matter of such laws, and in the redemption of lands from sales made under the taxing power of the State. As one of the measures of securing the widest publication and the most complete information to citizens, the measure of the minimum of compensation was introduced, apparently, for the purpose of preventing, through notions of false economy, the selection, by the members of either of the two political parties, of a paper which was not, by its character and influence, measured at least in part by its circulation, calculated to afford such information. The legislature must be presumed to have had intimate knowledge of the great pressure brought to bear upon individual members of the boards of supervisors, leading them, through a desire to avoid what to them would seem an unnecessary expenditure of money, to acts which were, in fact, subversive of the purpose of the statute requiring publication of laws and legal notices.

It is shown in the record before us that the proprietors of the Brockport Democrat, in order to secure this publication, which they called " patronage," offered to publish the same for twenty-five cents a folio, being five cents less than the minimum fixed by statute. This bid, so made to the supervisors, was accepted and acted upon by them in a manner which they themselves apparently regretted the day thereafter.

The certificate so designating the Brockport Democrat was directly in violation of the terms of the statute, which declared that the amount to be paid for the publication should not be less than thirty cents a folio, and that the rate to be paid for such publication must be fixed within those limits. Had the same gentlemen indicated by this document that the amount to be paid should be fifty-five cents per folio, being five cents above the maximum rate, the illegality of the designation would be apparent. Can it be deemed any less illegal because it fixes a rate at five cents lower than the minimum? I think not. Because, as if to make absolute this provision, the duty is laid upon the board itself to fix the limit

of compensation between the minimum and maximum price provided for by the statute. A gratuity of five cents more per folio than the law permits can hardly be deemed any less illegal under the terms of this statute than five cents per folio less than the minimum provided for by the same statute for publication.

A clear public policy is seen in this statute, which is, that through notions of false economy an opportunity shall not be given to the members of either of the political parties to designate a paper that is not calculated to give publicity to, as well as the actual printing of, the laws and notices.

This law was established for a public reason, and, in my judgment, it cannot be contravened by this private agreement made in the offer of the proprietors of the Brockport Democrat, and the acceptance thereof with a condition as to compensation. The court, I think, has the right to assume, upon the facts developed in this case, that the gentlemen so designating that journal would not have designated it, had not the offer to publish the proceedings been less than the minimum rate fixed by the statute. If this be so, the document carries within itself evidence of its own insufficiency and illegality, and should not be permitted to stand in the way of the designation, though subsequently made, of a journal that, as is conceded by both parties to this controversy, fairly represents one of the principal parties in the county. *Privatorum conventio juri publico non derogat.* That the infraction of this statute was deliberate admits of no doubt, for after the bid of the proprietors of the Brockport Democrat had been put in, the reading of this law was called for and the same was thereupon read to the whole board by its clerk, whereby there was actually brought home to them the fact, with a knowledge of which they are presumptively charged by law, that their proposed action was in violation of the terms of the statute.

While it is true that individuals may waive provisions of law prescribed for their advantage, and may gratuitously serve the public, if they see fit, yet, when private compacts in violation of the provisions of the statute are set up to defeat a claim made for services rendered in pursuance of law, the private compact must give way to considerations of public policy as disclosed by the course of legislation. In the case of the *People ex rel. Bush* v. *Thornton* (25 Hun, 456), it appeared that in Sullivan county, where the salary of the county

judge had been fixed for some years past at the sum of $2,500, the defendant, while a candidate for that post, advertised quite extensively that if elected he would fill the office for the sum of $1,200 a year, and would remit to the county $1,300 thereof. In his card or circular which he issued the defendant, there said: "I here repeat, that if elected to the office of county judge I will pledge myself to take only $1,200 for my services; that I will pay out of my own pocket the coal necessary to heat my law office; that I will pay for all stationery and letter-heads, and will see that those persons needing blanks shall pay for them themselves. If by so doing I have committed a criminal offense, let Judge BUSH make the most of it by lodging a complaint against me before the next grand jury. Has heaping on taxes become a virtue in this county, and an attempt to reduce them become a crime? Let the people answer." But the court held that all votes cast for that candidate under the influence of such promise were illegal, and that, in a proceeding in the nature of *quo warranto* against him, they should be rejected.

All contracts or agreements which have for their object anything which is repugnant or contrary to the provisions of the statute are void. (1 Comyn on Conts. [4th Am. ed.], 58; 1 Fonbl. Eq., book 1, chap. 4, §§ 4, 5.) But, says the learned counsel for the appellant, this under-cutting of prices was done " with a commendable view to economy." But, on the contrary, as was said by Judge ALLEN in *Collender* v. *Dinsmore* (55 N.Y., 210), " a contract does not depend upon its reasonableness for its validity," and I may add to this that much less can it depend upon its economy for its validity.

The order appealed from should be affirmed, with costs.

DWIGHT, P. J., concurred.

Order and judgment appealed from affirmed, with costs.